**STRAIGHT CREEK MINING, IN-CORPORATED, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 97–5677, 97–5834

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1998.

Decided Oct. 27, 1998.*

Ordered Published Dec. 14, 1998.

---

* This decision was originally issued as an "unpublished decision" filed on October 27, 1998. On December 3, 1998, the court designated the opinion as one recommended for full-text publication.

Robert N. Townsend (argued and briefed), Dan D. Rhea and Lewis R. Hagood (briefed), Arnett, Draper & Hagood, Knoxville, Tennessee, for Petitioner/Cross–Respondent.

David Habenstreit (briefed), John D. Burgoyne, Acting Deputy Associate General Counsel, National Labor Relations Board, Office of the General Counsel, Washington, D.C., Rachel Gartner (argued and briefed), Aileen Armstrong (briefed), National Labor Relations Board, Appellate Court Branch, Washington, D.C., for Respondent/Cross–Petitioner.

Before: KEITH, NELSON, and RYAN, Circuit Judges.

## OPINION

KEITH, Circuit Judge.

The National Labor Relations Board found Petitioner in violation of 29 U.S.C. § 158(a)(5) and (1), by failing and refusing to bargain collectively with the exclusive bargaining representative of its employees. The Board issued its decision and order on May 21, 1997, affirming the Administrative Law Judge's rulings, findings and conclusions, and adopting his recommended order as modified. The petitioner appeals, seeking an order from this Court setting aside the Board's decision. For the reasons stated below, we **AFFIRM** the Board's order.

### I.

Colquest Energy, Inc. ("Colquest") operated three underground coal mines in Clairfield, Tennessee, under an agreement with Kopper–Glo Fuels, Inc. ("Kopper–Glo"), to whom it sold all of the coal it produced from those mines. On June 29, 1990, the Board conducted a secret ballot election in which the production and maintenance employees at those mines voted to be represented by the United Mine Workers of America, AFL–CIO (the "Union"). Based on the election results, the Board certified the Union as the employees' collective-bargaining representative on January 18, 1991.

In August 1990, following the Board election, Colquest closed one of the three mines and an entire section of another, laying-off nineteen (19) of its approximately seventy-five (75) employees. In protest, the Union commenced a strike on October 1, 1990. On February 19, 1992, while the employees remained on strike, Colquest informed the Union that it would continue operations only to the extent necessary to complete the closing of its business. After that announcement, Colquest supervisors continued to work at the mines every day for the purpose of maintaining the mines and equipment. Furthermore, in response to Colquest's announcement Koper–Glo began discussions with prospective buyers of its leasehold operation, and from that time through the end of 1994, Kopper–Glo actively negotiated with several potential purchasers. During that period Kopper–Glo also employed former Colquest mining superintendents and several former Colquest employees to maintain the mines.

For twenty-eight (28) months following Colquest's announcement that it was going out of business, the Union continued to picket the mines. Colquest employees received strike benefits from the Union until July 15, 1994. Throughout that period, the Union conducted bi-weekly meetings. After the strike concluded, the Union's deputy director for the region continued to hold union meetings whenever an important event warranted, and regularly telephoned the Colquest employees.

On March 1, 1995, the petitioner, Straight Creek Mining (the "Company") was incorporated as a Tennessee corporation by Ronald Carroll, who owned and operated the brokerage company through which Kopper–Glo had sold the coal mined by Colquest. At that time the Company began mining coal at the Colquest mine that had been operational immediately prior to the strike, acting as a contract miner for Kopper–Glo. A majority of the Company's employees had been bargaining unit employees of Colquest, and five of the six supervisors employed by the Com-

pany held similar positions at Colquest. The Company's employees used the same equipment previously used by Colquest, and performed their work in essentially the same manner.

By letter dated June 6, 1995, the Union requested that the Company, as the successor to Colquest, recognize the Union as the official bargaining representative and enter into negotiations for a new collective bargaining agreement. The Company refused that request. Based on these findings, the Board agreed with the ALJ that the Company was a "successor employer" to Colquest and that it violated the relevant provision of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1) (the "Act"), by refusing to recognize and bargain with the Union that represented Colquest's employees. The Board's order required the Company to cease and desist from the unfair labor practices found, and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act, 29 U.S.C. § 157. Affirmatively, the order directed the Company to recognize the Union as the bargaining representative of the unit employees, and upon request, to bargain in good faith with it concerning hours, wages, and other terms and conditions of employment. The order also required the Company to post an appropriate remedial notice.

## II.

In its petition for review, the Company contends the Board erroneously concluded that the Company was a successor employer to Colquest, because there was no "substantial continuity" between the two enterprises. In the alternative, the Company argues that its refusal to bargain with the Union was justified by good faith doubt that the majority of the employees continued to support the Union, and that the Board's findings to the contrary were erroneous.

■ The Board's determination of successorship is a finding of fact. *IMS Mfg. Co. Inc. v. NLRB*, 813 F.2d 113 (6th Cir.1987). On review, we "must uphold the findings of the Board on questions determinative of suc-

cessorship if supported by substantial evidence" in the record as a whole. *Id.*

Section 8(a)(5) of the Act prohibits employers from refusing to bargain with unit representatives of its employees. Under the doctrine of successorship a change in employer does not itself destroy the obligation to the bargaining unit. "The basic rationale is that a mere change in ownership, without an essential change in working conditions, would not be likely to change employee attitudes toward representation." *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 627 (9th Cir. 1983).

As the Supreme Court explained in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39–40, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987), "[i]f the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation. This feeling is not conducive to industrial peace." Thus, where a new employer acquires a business without changing its essential nature, and a majority of its employees previously worked for the predecessor, the new employer has a duty to recognize and bargain with the incumbent union representing its predecessor's employees. *Id.* at 36–41, 107 S.Ct., at 2232–35.

■ In making a determination as to whether a new employer is a successor, the Board must consider the totality of the circumstances. *Id.* at 43, 107 S.Ct., at 2236. Essentially, "the focus is on whether there is 'substantial continuity' between the enterprises," meaning "the new company has 'acquired substantial assets of its predecessor and continued, *without interruption or substantial change,* the predecessor's business operations.'" *Id.* (emphasis added); *accord Briggs Plumbingware, Inc. v. NLRB*, 877 F.2d 1282, 1285–86 (6th Cir.1989). The threshold inquiry for ascertaining the existence of such "substantial continuity" is whether the majority of the new employer's workforce was previously employed by the predecessor. If so, the Board then must examine a number of additional factors to determine whether "substantial continuity"

exists, including: (1) whether the business of the two entities remains unchanged; (2) whether the employees continue to perform the same job functions under unchanged working conditions; (3) whether the production processes remain the same; and (4) whether the new entity provides the same customers with the same product. *Fall River,* 482 U.S. at 43, 107 S.Ct., at 2236. Where these factors are found, courts will not overturn the Board's determination. *See Id.* (successorship found where employer acquired most of predecessor's real property, machinery, and equipment, and used same production process as predecessor); *NLRB v. Phoenix Pipe & Tube, L.P.,* 955 F.2d 852, 856 (3d Cir.1991) (employer found to be successor where manufacturing process and use of machinery was essentially identical to that of predecessor, and where employer sold products to substantially same customers).

■ On appeal, the Company does not dispute that the Board made findings consistent with the factors outlined in *Fall River.* The record is clear that the majority of the Company's workforce, working conditions, production process, supervisors, and mining operations remained unchanged. It is also undisputed that the Company acquired most of its predecessor's machinery and equipment. The Company's position, however, is that a 54-month "hiatus" in production between Colquest's final shutdown and the Company's assumption of operations destroyed any continuity created by the other factors. This argument is unpersuasive.

■ While the Sixth Circuit has not directly addressed the issue, the Supreme Court has recognized that such a hiatus can destroy continuity. *Id.* at 45, 107 S.Ct., at 2237. A hiatus however, is only one consideration in a continuity inquiry, and "is relevant only when there are other indicia of discontinuity." *Id.* In other words, a hiatus is not entitled to any weight unless it is "one of many factors pointing to such a substantial transformation in the nature of the predecessor's operations that a real question was presented, by the combination of circumstances, as to the employees' desires with respect to representation." *United Food & Commercial Workers v. NLRB (Spencer Foods),* 768 F.2d 1463, 1472 (D.C.Cir.1985) (quoting *NLRB v. Band-Age, Inc.,* 534 F.2d 1, 5 (1st Cir.), *cert. denied,* 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976)); *cf. Molded Fiber Glass Body Co.,* 182 N.L.R.B. 400, 402–03 (1970) (noting that the occurrence of a lengthy hiatus may well weigh against the reimposition of bargaining obligations where the employer had a fixed and enduring intention to dispose of the plant or close it permanently).

Despite the Company's contention, there are no other indicia of discontinuity sufficient to invoke the hiatus factor in this case. As found in the record, the hiatus in production was precipitated by the Union's decision to strike, not by Colquest's decision to go out of business. Moreover, in the 16 months immediately following the commencement of the strike, Colquest nominally continued its operations and permitted routine maintenance inspections on the mine site to preserve the operating equipment. As the board emphasized, "the mine remained available for reopening" even after Colquest announced that it was going out of business. Thus, the significance of the hiatus is lessened by the overwhelming evidence of continuity in the operations.

Notwithstanding, it does not necessarily follow that every hiatus, regardless of duration, is insubstantial where nominal operations are continued. However, given the instant sequence of events and actions of Colquest and Kopper–Glo the employees and the Union had every reason to believe Colquest was an ongoing entity and would continue to be so in the future.[1] Accordingly, the Board's findings are clearly supported by the record and are affirmed.

### III.

The Company's alternative position is that it had no obligation to bargain with the Union because it had a good faith doubt that the

---

1. Not only were the mines maintained, but during the hiatus Colquest also completed construction of an expensive silo and belt system for the haulage and storage of coal which, as the ALJ reasoned, was "inconsistent with any intention to cease operations."

majority of its workforce continued to support the Union. Unless the Board's finding was unsupported by substantial evidence on the record as a whole, its determination that the Company's refusal to bargain was unjustified by good faith doubt must also be affirmed. *NLRB v. Dayton Motels, Inc.*, 525 F.2d 476, 477 (6th Cir.1975).

 Once established, the bargaining representative is entitled to a conclusive presumption of majority status for one year following its certification. *NLRB v. Burns Int'l Sec. Services, Inc.*, 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). After that period, the union is entitled to a rebuttable presumption of majority support. *Id.* Nevertheless, the presumption may only be rebutted if the employer can establish that it had a reasonable good faith doubt as to the Union's majority support. *NLRB v. Pennco, Inc.*, 684 F.2d 340, 342 (6th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). The Company's argument fails on this ground.

The Company asserts that the closing of Colquest, in and of itself, destroyed any presumption of continuing majority status by the Union. Essentially, the Company contends that the 54-month hiatus was clear indication that the Union had become inactive and thus lost support of the majority of its workforce. This argument is speculative at best. An employer's good faith doubt cannot be based merely on the passage of time, but "must be supported by 'objective considerations which are clear, cogent, and convincing.'" *NLRB v. Flex Plastics, Inc.*, 726 F.2d 272, 275 (6th Cir.1984); *Pennco, Inc.*, 684 F.2d at 342 ("The relevant date to look to in determining the bona fides of the employer's doubts is the date that recognition is withdrawn; subsequent events cannot validate an improper withdrawal of recognition."). Without more, the hiatus cannot be evidence of lost support.

The Company's only other argument supporting its claim of good faith doubt is its contention that prior to the hearing certain mine employees forwarded some type of communication to the Regional Director of Region 10. The Company admits, however, that it did not learn of this evidence until after it had refused to recognize and bargain with the Union. As a result, the ALJ excluded the evidence from the record as irrelevant to the determination of the Company's good faith belief at the time it withdrew its recognition. Therefore, even assuming the letter is remotely supportive of the Company's position, it cannot now rely on its contents in support of its previous decision. As a result, the Company's challenge to the Board's finding is unsupported by the record as a whole and the Board's order is affirmed.

### IV.

For the reasons discussed above, the National Labor Relations Board's order is AFFIRMED.