RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0209P (6th Cir.)
File Name: 03a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

3750 ORANGE PLACE LIMITED
PARTNERSHIP, d/b/a
Beachwood Holiday Inn;
SNAVELY DEVELOPMENT CO.,
INC., a/k/a Snavely
Management Services;
SNAVELY HOTEL SERVICES,
LLC,

           *Petitioners/*
     *Cross-Respondents,*

        *v.*

NATIONAL LABOR RELATIONS
BOARD,

       *Respondent/*
     *Cross-Petitioner.*

Nos. 01-2385/2734

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
Nos. 8-CA-28382-1; 8-CA-28382-2; 8-CA-29904.

Argued: May 1, 2003

Decided and Filed: June 24, 2003

Before: NELSON and COLE, Circuit Judges; ROSEN,*
District Judge.

───────────────

## COUNSEL

**ARGUED:** Sanford Gross, GROSS & GROSS, L.L.C., Cleveland, Ohio, for Petitioners. Kathleen Lyon, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Sanford Gross, Robert L. Gross, GROSS & GROSS, L.L.C., Cleveland, Ohio, for Petitioners. Kathleen Lyon, Aileen A. Armstrong, Fred L. Cornnell, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

───────────────

## OPINION

───────────────

ROSEN, District Judge.

### I. INTRODUCTION

Petitioners-Cross-Respondents 3750 Orange Place Limited Partnership ("Orange Place"), Snavely Development Company, Inc. ("Management Services"), and Snavely Hotel Services, LLC ("Hotel Services") petition for review of the August 23, 2001 Decision and Order of Respondent-Cross-Petitioner the National Labor Relations Board (the "Board") requiring Petitioners, as successor employers, to recognize, bargain with, and provide information to the Service Employees International Union, Local 47 (the "Union") as the collective-bargaining representative of the housekeeping unit at the Holiday Inn Beachwood ("HIB"). The Board's decision

───────────────

*The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

and order affirmed the April 29, 1999 conclusion of the Administrative Law Judge (the "ALJ") that Petitioners had committed unfair labor practices in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "Act"). The Board cross-petitions for enforcement of its final order.

For the reasons stated below, we GRANT the Board's petition and direct the enforcement of its final order.

## II. BACKGROUND

### A. Factual Background

Ownership of HIB, a full service hotel in Beachwood, Ohio, changed hands three times between October 1995 and January 1998: from Summit Associates, Inc. ("Summit") to Citizens Service Corporation (the "Bank") to Petitioner Orange Place to Patriot American Hospitality Operating Partnership, L.P. ("Patriot").

### 1. Summit and Lane Own and Manage HIB

Early in October, 1995, Summit owned HIB, along with a sister property, the Holiday Inn Mayfield ("HIM"). Lane Hospitality ("Lane") managed both hotels on behalf of Summit. Summit authorized Lane to enter into a collective bargaining agreement with the Union effective May 1, 1994 to April 30, 1997 (the "CBA"). Dennis Dingow, the Union's business representative, testified before the ALJ that the CBA represented the most recent embodiment in a series of collective bargaining agreements between the parties. Although the CBA did not specifically define the bargaining unit represented by the Union, Dingow explained that the hotels' housekeeping departments constituted the historical bargaining unit represented by the Union. Dingow further testified that the bargaining unit included housekeepers and housemen (porters), but excluded inspectresses and laundry workers.

### 2. Summit Transfers the Hotels to the Bank

On October 12, 1995, Summit transferred HIB and HIM to the Bank in lieu of foreclosure. In conjunction with this transfer, the Bank retained Beck-Group Management Corp. ("Beck") to operate the hotels. Beck, in turn, retained Hospitality Employee Leasing Program, Inc. ("HELP") to manage the facilities. Under the terms of the October 12, 1995 Client Services Agreement entered into with Beck, HELP agreed to furnish personnel, including housekeeping employees, to Beck to operate HIB and HIM. Beck and HELP further agreed that all individuals assigned by HELP to the hotels would remain HELP employees. The ALJ found that a majority of the housekeeping employees retained by HELP to work at the hotels were former Lane employees. Furthermore, no break in operations occurred during the transfer of ownership and management from Summit and Lane to the Bank, Beck, and HELP.

In an October 6, 1995 letter, Summit notified the Union that it was terminating the CBA and its covered employees in conjunction with the transfer of HIB and HIM to the Bank. This correspondence included a draft termination letter to employees, indicating that HELP would have employment application forms at the front desk. Upon transfer of the hotels to the Bank, neither the Bank, Beck, nor HELP assumed the CBA.

### 3. HELP's Interactions with the Union

In an October 18, 1995 letter, the Union notified HELP of the Union's position that HELP was a successor employer to Lane, obligating HELP to bargain with, and provide information to, the Union. The Union sent follow-up letters to HELP on October 25 and November 8, 1995 requesting information on employees and dates to commence negotiations. In a November 17, 1995 response, HELP's attorney objected to the conduct of Union representatives at

HIB, but expressly assured the Union that HELP was "not refusing to bargain." [J.A. at 354].

Thereafter, at a December 14, 1995 meeting, HELP and the Union discussed demonstrations at HIB and the Union's earlier information requests. Following this face-to-face meeting, HELP's attorney sent a follow-up letter to the Union on December 21, 1995. This letter, captioned "SEIU & Negotiations with HELP, Inc.," provided, in pertinent part:

> Per your request, attached is a breakdown of the costs for health insurance and a description of the coverage. In addition, we have attached a list of the housekeeping employees at the Mayfield and Beechwood facilities along with their hourly rates. We are in the process of developing a contract proposal and should have something to discuss with you sometime in January. . . .

[J.A. at 356]. Despite a February 9, 1996 follow-up letter from the Union, HELP did not provide the Union a contract proposal prior to the Bank's sale of HIM and HIB to separate parties in February and May of 1996, respectively.[1]

### 4. Orange Place Acquires HIB

Petitioner Orange Place acquired HIB from the Bank on May 13, 1996, and that same day retained Petitioner Management Services to operate the hotel. The management agreement between Orange Place and Management Services granted Management Services the power to hire and discharge employees of HIB. John T. Snavely, the managing partner of Orange Place and an owner of Management Services, signed

---

[1] Following a series of transactions, the Bank transferred HIM to a third party in February of 1996. The Board found that the sale of HIB and HIM to separate parties constituted compelling circumstances justifying the division of the historic bargaining unit into two separate units, a housekeeping unit at HIM and a separate housekeeping unit at HIB. On appeal, Petitioners do not contest this finding.

the management agreement on behalf of both parties. No hiatus in operations occurred during the transfer of ownership and management from the Bank and HELP to Orange Place and Management Services.

Petitioners' own witness, James Gerish, submitted an affidavit to the ALJ indicating that Orange Place/Management Services hired twenty-two housekeeping employees upon taking possession of HIB, twelve of which were former HELP employees. Based on this affidavit and a comparison of payroll and other records for the relevant period, the Board found that Orange Place/Management Services retained a majority of HELP's housekeeping employees.

### 5. Orange Place and Management Services Refuse to Bargain with the Union

On May 6 and May 24, 1996, both shortly before and shortly after Orange Place's acquisition of HIB, the Union sent letters to Management Services requesting information on HIB's housekeeping employees and dates to commence negotiations over a new collective bargaining agreement.[2] Counsel for Management Services and Orange Place responded to the Union on May 29, 1996, indicating that Orange Place owned HIB, and that his office was looking into the issues raised by the Union.[3] Receiving no further

---

[2] Petitioners' statement (at page twelve of their initial brief) that the Union's May 1996 request to bargain "came well over seven (7) months past the last demand by the Union to bargain with HELP in October 1995" is simply inaccurate. In point of fact, as described above, the Union sent a follow-up letter to HELP in November 1995; HELP and the Union held a meeting in December 1995; and the Union sent another follow-up letter to HELP in February 1996.

[3] Petitioners' depiction of the record (at page twelve of their initial brief) indicating that Orange Place responded to the Union in a May 29, 1996 letter that "no obligation existed to bargain with the Union" is similarly misleading. In reality, counsel for Orange Place and Management Services indicated in the May 29 letter that "our office shall

response, on July 11, 1996, the Union filed an unfair labor practice charge against Orange Place, alleging that as a successor employer, Orange Place was unlawfully refusing to recognize, bargain with, and provide information to the Union in violation of the Act. Responding to the Union's charge, the Board's General Counsel issued a complaint against Orange Place on August 28, 1997.

### 6.  Orange Place Sells HIB to Patriot

On January 13, 1998, while the General Counsel's unfair labor practice complaint against Orange Place was pending, Orange Place sold HIB to non-party Patriot. At this time, Petitioner Hotel Services assumed the operation and management of HIB from Management Services, without a break in operations. Hotel Services, whose President James Gerish was also an employee and former President of Management Services, is a limited liability company, whose sole member is Management Services. The entities are engaged in the same business -- the management of hotels -- and share offices as well as the same human resources director. It is undisputed that upon assuming management responsibilities from Management Services, Hotel Services retained all seventeen housekeeping employees at HIB, without applications or interviews.

### 7.  Hotel Services Also Refuses to Bargain with the Union

On May 4, 1998, the Union sent a letter to Patriot, Management Services, and Hotel Services, detailing the Union's numerous efforts to pursue its bargaining rights and renewing the Union's request for information and bargaining on behalf of the housekeeping employees at HIB. Counsel for Hotel Services responded to the Union on May 8, 1998, indicating that Hotel Services was the current employer at

---

immediately look into the issues raised in your correspondence and respond to same as soon as possible." [J.A. at 414].

HIB under contract with Patriot, that Hotel Services was under no legal obligation to bargain with or provide information to the Union, and that Hotel Services did not believe that the Union represented a majority of the employees at HIB in an appropriate unit.

### B.  Procedural History

On May 12, 1998, the Union filed an unfair labor practice charge against Orange Place, Management Services, and Hotel Services, alleging that the entities were violating Sections 8(a)(1) and (5) of the Act by refusing to recognize, bargain with, and provide information to the Union.[4] The General Counsel consolidated the case with the 1996 complaint against Orange Place, and issued an amended consolidated complaint against Petitioners on August 31, 1998.

Following a two-day hearing in January 1999, the ALJ issued an April 29, 1999 decision concluding, *inter alia*, that: (1) the housekeeping employees at HIB, consisting of housekeepers and housemen only, constituted a unit appropriate for collective bargaining under the Act; (2) Orange Place and Management Services became joint employers at HIB when the Bank transferred the hotel to Orange Place; (3) Management Services and Hotel Services were a single employer within the meaning of the Act; and (4) Orange Place, Management Services, and Hotel Services, as successor employers, each violated Sections 8(a)(1) and (5) of the Act by failing to recognize, bargain with, and provide information to the Union. In an August 23, 2001 Decision and Order, the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted, with minor

---

[4]The Act provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title" or "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. §158(a)(1) and (5).

corrections, the ALJ's recommended order that Petitioners, among other items, cease and desist from their violations of the Act and provide information to and engage in bargaining with the Union.

Petitioners now petition for review of the Board's Decision and Order, arguing that the Board misapplied federal labor law by limiting its successorship analysis to the relationship among and between Petitioners and HELP, rather than examining whether an unbroken chain of successorship existed across HIB's chain of ownership. Even if the Board can establish such an unbroken chain, Petitioners further contend that, for many reasons discussed in detail below, substantial evidence does not support the Board's conclusion that they are successor employers with an obligation to recognize, bargain with, and provide information to the Union. Lastly, Petitioners assert a variety of affirmative defenses and evidentiary objections. In response, the Board cross-petitions for enforcement of its August 23, 2001 order.

### III. ANALYSIS

#### A. Standard of Review

Although we review *de novo* the Board's legal conclusion regarding the proper scope of the successorship analysis in this case, *see Michigan Cmty. Services, Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002), we must uphold the Board's factual findings, including its determination of successorship, if they are supported by substantial evidence in the record as a whole. *Straight Creek Mining, Inc. v. NLRB,* 164 F.3d 292, 295 (6th Cir. 1998).

#### B. The Successorship Doctrine

Setting aside for the moment Petitioners' affirmative defenses and evidentiary challenges, the present case turns on the often litigated issue of successorship. Under a long line of cases stretching back to *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S. Ct. 1571 (1972),

the Supreme Court has distilled the responsibilities of new employers to incumbent unions following a change in ownership. Although a new employer is not bound by the substantive terms of a collective bargaining agreement entered into by its predecessor absent an express or implied assumption of the agreement, a mere change of ownership does not *ipso facto* absolve a new employer of all responsibilities to bargain. Rather, under the successorship doctrine, if the new employer constitutes a "successor employer" for purposes of federal labor law, such new employer is obligated to recognize, bargain with, and provide information to the incumbent union. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 36, 107 S. Ct. 2225, 2232 (1987); *Burns*, 406 U.S. at 278-79, 92 S. Ct. at 1577; *Straight Creek,* 164 F.3d at 295; *see also Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S. Ct. 1123, 1125 (1979) (noting that the duty to bargain under Section 8(a)(5) of the Act includes a duty to provide relevant information).

This rule strikes a careful balance between the bargaining freedom of new employers and the legitimate expectation of employees to continued representation by their union following a change of ownership. As explained by the Supreme Court in *Burns*:

> A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm. The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems

appropriate, but to allow the balance of bargaining advantage to be set by economic power realities.

406 U.S. at 287-88, 92 S. Ct. at 1582.

In determining whether an entity constitutes a successor employer, the Board makes a factual determination based on the totality of the circumstances. *Fall River Dyeing*, 482 U.S. at 43, 107 S. Ct. at 2236. While the Board weighs a number of factors, the primary focus centers on whether there is a "substantial continuity" between the enterprises, meaning the new employer has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Id.* (quotations and citations omitted). As outlined in our previous cases:

> The threshold inquiry for ascertaining the existence of such "substantial continuity" is whether the majority of the new employer's workforce was previously employed by the predecessor. If so, the Board then must examine a number of additional factors to determine whether "substantial continuity" exists, including: (1) whether the business of the two entities remains unchanged; (2) whether the employees continue to perform the same job functions under unchanged working conditions; (3) whether the production processes remain the same; and (4) whether the new entity provides the same customers with the same product.

*Straight Creek*, 164 F.3d at 295-96 (citing *Fall River Dyeing*, 482 U.S. at 43, 107 S. Ct. at 2236). Thus, "if the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from its predecessor, the bargaining obligation of section 8(a)(5) of the NLRA to negotiate with the majority representative is activated." *Lincoln Park Zoological Soc'y v. NLRB*, 116 F.3d 216, 218 (7th Cir. 1997) (citing *Fall River Dyeing*, 482 U.S. at 37, 107 S. Ct. at 2232-33).

## C. The Board Properly Limited Its Successorship Analysis to Petitioners and HELP

Returning to the present case, we first address Petitioners' threshold legal contention that the Board misapplied federal labor law by limiting its successorship inquiry to the relationship among and between Petitioners and HELP.

While conceding that in a typical successorship case involving the transfer of a business from one party to the next, the Board only needs to examine the relationship between a new employer and its immediate predecessor, Petitioners argue that in cases involving multiple changes of ownership, the Board must broaden the inquiry and establish an unbroken chain of successorship across the change of ownership. Under Petitioners' theory, the Board therefore erred by first failing to establish that the Bank, Beck, and HELP were successor employers, prior to examining whether Orange Place and Management Services were successor employers to HELP. In response, the Board asserts that because HELP voluntarily recognized and bargained with the Union, standard successorship analysis applies and the Board properly limited its inquiry to the relationship among and between Petitioners and HELP. In light of the unique factual circumstances of this case, we agree with the Board.

Although this Circuit has not addressed the precise theory raised by Petitioners, for the reasons set forth below, resolution of the issue turns on whether HELP voluntarily recognized the Union prior to the Bank's transfer of the hotel to Orange Place. If so, the Union is entitled to a presumption of majority status, and this case requires, as the Board contends, only a "run of the mill" successorship examination of Petitioners and their immediate predecessor HELP. As cogently summarized by the Supreme Court:

> Where, as here, the union has *a rebuttable presumption of majority status*, this status continues despite the change in employers. And the new employer has an

obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor.

*Fall River Dyeing*, 482 U.S. at 41, 107 S. Ct. at 2235 (emphasis added); *see also Lincoln Park*, 116 F.3d at 218 (explaining that a new employer's status as a successor employer triggers the Act's obligation to bargain with the majority representative).

If, on the other hand, HELP did not voluntarily recognize the Union during HELP's tenure as the employer at HIB, then Petitioners may be correct that the Board erred by limiting its successorship analysis to the relationship among and between Petitioners and HELP. In this event, we would then, and only then, be required to determine whether the successorship doctrine mandates the examination of other employers in the chain of ownership. *See generally Bakery, Confectionary & Tobacco Workers Union Local No. 19 v. Ryan's I.G.A.*, 642 F. Supp. 1131 (N.D. Ohio 1985) (where in conducting a *Burns* style successorship analysis, the district court focused on the relationship between the original employer and the ultimate new employer, leaving an intermediary employer out of the analysis).[5]

---

[5]Contrary to Petitioners' repeated assertions, our earlier decision in *Service, Hospital, Nursing Home & Public Employees Union Local 47 v. Cleveland Tower Hotel, Inc.*, 606 F.2d 684 (6th Cir. 1979) did not address the question of whether the Board must find an unbroken chain of successorship across multiple changes in ownership. In *Cleveland Tower*, a hotel was placed in receivership and then later sold to a limited partnership. During the receivership, the receiver entered into collective bargaining agreements with the appellant union. After agreeing with the district court's finding that the court-appointed receiver was the employer during the receivership, we concluded that the partnership was not a successor employer to the receiver because the record did not reflect, as required by *Burns* and its progeny, that the partnership hired a majority of the receiver's employees. *Id.* at 687. Accordingly, the court did not reach the question of whether the Board also needed to establish that the

Turning to the issue of majority representation, unions generally achieve majority status through Board certification. *See Fall River Dyeing*, 482 U.S. at 37-38, 107 S. Ct. at 2232-33; *Lincoln Park*, 116 F.3d at 219. Once certified by the Board as a bargaining unit representative, a union then is entitled to a conclusive presumption of majority status for one year following certification, after which the presumption becomes rebuttable. *Fall River Dyeing*, 482 U.S. at 37-38, 107 S. Ct. at 2233. These presumptions remain intact across a change of ownership, and further the Act's "overriding policy" of promoting industrial peace, which becomes "particularly pertinent" in the successorship context:

During a transition between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it. While being concerned with the future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer. Accordingly, during this unsettling transition period, the union needs the presumptions of majority status to which it is entitled to safeguard its members' rights and to develop a relationship with the successor.

The position of the employees also supports the application of the presumptions in the successorship situation. If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation. This feeling is not conducive to industrial peace. In addition, after being hired by a new company following a layoff from the old,

---

receiver was a successor employer to the original owner of the hotel.

employees initially will be concerned primarily with maintaining their new jobs. In fact, they might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems associated with it. Without the presumptions of majority support and with the wide variety of corporate transformations possible, an employer could use a successor enterprise as a way of getting rid of a labor contract and of exploiting the employees' hesitant attitude towards the union to eliminate its continuing presence.

*Id.* at 39-40, 107 S. Ct. at 2233-34 (footnotes omitted).

While in this case, no Board certification of the Union occurred during HELP's tenure at HIB, it is well accepted that majority status also may result from an employer's "voluntary recognition" of the union. *See Lincoln Park*, 116 F.3d at 219; *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1246 (D.C. Cir. 1994). It is less clear, however, whether the presumptions of majority status that accompany Board certification of a union, also apply to voluntary recognition in the successorship context. Although this Circuit has not addressed the question, we agree with the Seventh Circuit and the Circuit Court of Appeals for the District of Columbia that a predecessor employer's voluntary recognition of a union also gives rise to a presumption of majority status in a successorship situation, thereby obligating a new employer to bargain with the union under the successorship doctrine. *Id.*

In *Lincoln Park*, a private society that assumed operation of the Lincoln Park Zoo from the Chicago Park District in 1995 refused to recognize and bargain with the public employees union that had represented the District's zoo employees on the grounds that the union had never attained Board certification. In concluding that the Society was obligated to bargain with the union under the successorship doctrine, the Seventh Circuit first explained that, similar to Board certification, an employer's voluntary recognition of a union gives rise to a rebuttable presumption of majority status:

In *Fall River Dyeing*, the Supreme Court elaborated on the policy reasons behind the successorship doctrine: the NLRA seeks to achieve "industrial peace"; by maintaining stability in the administration of collective bargaining agreements and curbing the temptation to avoid good faith bargaining through delay, the successorship doctrine is in accord with the NLRA. *See* 482 U.S. at 38, 107 S. Ct. at 2233. Because attributing majority status to a certified union reinforces this stability sought by the NLRA, the Supreme Court accepted the NLRB's presumption. Here, crediting a union that has been voluntarily recognized by the predecessor employer with majority status would have this same steadying effect and thus be consistent with the NLRA. Accordingly, we hold that voluntary recognition can give rise to a rebuttable presumption of majority status in a successorship situation.

*Lincoln Park*, 116 F.3d at 219; *see also Exxel/Atmos*, 28 F.3d at 1246 ("If the employer chooses voluntarily to recognize the union . . . the union enjoys a presumption of continuing majority support").

The *Lincoln Park* Court then explained the standard for voluntary recognition as follows:

Implicit in the process of voluntary recognition are protections for both employer and employee. First, in an instance of voluntary recognition it is presumed that the employer will always have an initial chance to refuse to recognize a union. Second, at the time of voluntary recognition, there is generally some showing of majority support, short of an election, by the employees (e.g., a majority card showing).

116 F.3d at 219. In determining that the record contained substantial evidence to support a finding that the Park District

had voluntarily recognized the union for purposes of federal labor law, the panel reasoned that: (1) the Park District had affirmed the union's majority status in successive collective bargaining agreements stretching back to 1984; (2) Park District employees had never invoked their right under state law to petition for decertification of the union; and (3) there was no record of dissatisfaction with the bargaining relationship. *Id.* at 220.

Applying these principles here, it is clear that our first task is to determine whether HELP's dealings with the Union constituted "voluntary recognition," thereby allowing the Union to attain a presumption of majority status. If so, the Board properly limited its successorship analysis to Petitioners' immediate predecessor employer, HELP. Impliedly acknowledging this fact, Petitioners contend that HELP never recognized or bargained with the Union. However, giving appropriate deference to the Board's factual findings, a review of the record reveals substantial evidence which undermines Petitioners' contentions and supports the Board's conclusion that HELP voluntarily recognized and bargained with the Union. In reaching this conclusion, we emphasize that our decision rests more on the particular factual record before us than on any novel interpretation of the law.

We begin our analysis by observing that this case fits squarely within the economic reality paradigm that the Supreme Court first identified in *Burns*: Namely, an employer at a financially struggling business trying to attract a potential buyer.[6] The employer knows that if it saddles the business with an onerous union contract, its prospects for a favorable acquisition will be adversely, perhaps fatally, impacted. It also knows, however, that if it refuses outright to bargain with an incumbent union, it may well be buying itself disruptive labor problems -- and employee

---

[6] *See Burns,* 406 U.S. at 287-88, 92 S. Ct. at 1582.

dissatisfaction and dissension -- that will similarly make it an unattractive opportunity for acquisition and undermine its market value. Faced with this dilemma, the employer tries to dodge both bullets by seeming to negotiate and deal in a cooperative way as if looking toward entering into an agreement, but yet not actually entering into an agreement that a purchaser would find unattractive.[7]

This is precisely what happened here. Thus, the question is: Did the employer, HELP, go so far in its conduct to maintain a relationship with the Union -- and not create a schism -- that it effectively recognized the Union's role as the employees' bargaining representative? We find substantial evidence in the record to support the Board's finding that it did.

More specifically, when the Union promptly contacted HELP only a few days after the Bank's acquisition of HIB, HELP had an opportunity to refuse to recognize the Union. Rather than exercise this opportunity, HELP's attorney expressly indicated to the Union in a November 17, 1995 letter that HELP was not refusing to bargain. Thereafter, HELP took additional specific steps to recognize and bargain with the Union. In particular, on December 14, 1995, representatives of HELP and the Union met face-to-face and discussed the Union's former collective bargaining agreement with Lane and the Union's previous information requests regarding HELP's housekeeping employees.

On December 21, 1995, HELP's attorney sent the Union a follow-up letter expressly referring to HELP's negotiations with the Union. And, it did two other significant things with this letter: It included a list of housekeeping employees

---

[7] We recognize that in this situation, the Union, too, is in something of a dilemma. It does not want to push a financially struggling business so hard that a potentially strong purchaser of the company will be scared off, but at the same time, it must do everything it can to maintain its status as the employees' recognized bargaining representative.

(presumably so that the Union could identify all members of the bargaining unit), and further indicated that HELP was in the process of developing a contract proposal for the Union. Even though we understand HELP's dilemma, taken as a whole, these actions by HELP, intending to perpetuate some cooperative relationship with the Union, are all consistent with a finding of voluntary recognition.

Neither is our decision on this point made in a vacuum. What is also significant here is the historical context in which this dance between the employer and the Union occurred. Analogous to *Lincoln Park,* the present case involves a long-standing union relationship with the bargaining unit at HIB. Indeed, although HELP only dealt with the Union for a period of months, the Board found that the Union had represented the housekeeping employees at the hotels for upwards of twenty years, as embodied in successive collective bargaining agreements with Summit/Lane. Finally, as was the case in *Lincoln Park*, the record contains little or no evidence indicating that HIB's housekeeping employees ever sought decertification of, or expressed dissatisfaction with, the Union.

We conclude this portion of our analysis by observing that we also ground our conclusion on the fact that the Union pursued its rights with all deliberate speed following Summit's October 1995 transfer of HIB to the Bank. As a result of these efforts, the Union secured a promise from HELP that HELP would deliver a contract proposal to the Union by January 1996. Despite this promise, HELP failed to deliver a contract proposal prior to the Bank's transfer of HIB to Orange Place in May 1996. Given these circumstances, we cannot reward Petitioners for the fact that HELP effectively strung the Union along for several months, thereby preventing the Union from finalizing a new collective bargaining agreement. To do so would encourage delaying tactics and thereby undermine the Act's primary purpose of promoting industrial peace.

## D. The Board's Successorship Findings

Having found that the Board engaged in the proper successorship analysis, we turn our attention to whether substantial evidence supports the Board's factual conclusion that Petitioners are, in fact, successor employers with an obligation to recognize, bargain with, and provide information to the Union.

### 1. Substantial Evidence Supports the Board's Findings that Orange Place and Management Services are Joint Employers and Successor Employers to HELP

As an initial step in its successorship analysis, the Board found that Petitioners Orange Place and Management Services were joint employers at HIB. "'[W]here two or more employers exert significant control over the same employees -- where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment -- they constitute 'joint employers' within the meaning of the NLRA.'" *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985) (quoting *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)).

Here, in connection with its acquisition of HIB, Orange Place entered into a management agreement with Management Services. In this agreement, Orange Place expressly retained its status as the employer at HIB, but granted Management Services the right to hire, discharge, train, and pay employees, and to determine such employees' compensation. In light of this co-mingling of employment responsibilities in the management agreement, we readily

conclude that substantial record evidence supports the Board's joint employer finding.[8]

Having found joint employer status, the Board then found that Orange Place and Management Services were successor employers to HELP at HIB. As noted, the threshold inquiry in the successorship determination is whether Orange Place and Management Services retained a majority of HELP's housekeeping employees when Orange Place acquired HIB. *See Straight Creek*, 164 F.3d at 295. Although the Board found such a majority based on a somewhat muddled record, Petitioners' own witness, James Gerish, submitted an affidavit to the ALJ indicating that twelve of the twenty-two housekeepers and housemen initially hired by Orange Place and Management Services were former HELP employees. This affidavit, along with the corroboration provided by payroll and other records regarding the number and types of employees at HIB during the relevant time periods, provides substantial support for the Board's finding that Orange Place and Management Services initially retained a majority of HELP's housekeepers and housemen.

With respect to the remaining successorship factors enumerated in *Straight Creek*, substantial record evidence supports the Board's finding that there was a "substantial continuity" of operations at HIB across the transfer of ownership from the Bank to Orange Place. In particular, the record reveals that there was no interruption in operations in connection with the sale to Orange Place, and that the hotel continued to provide similar hotel services to the same types of customers. Moreover, even accepting Petitioners' conclusory assertion that they instituted a new "team approach" in HIB's housekeeping department, Petitioners cannot reasonably dispute that the housekeepers and

---

[8]Petitioners' unfounded objections to the Board's joint employer finding are based on the wrong legal standard: Namely, the standard for finding "single employer" status, which is discussed in greater detail, *infra,* at note 9.

housemen continued to perform the same or similar job functions (e.g., cleaning rooms and carrying bags) under the same or similar working conditions. In short, given the totality of the circumstances, substantial evidence supports the Board's conclusion that Orange Place and Management Services were successor employers to HELP, and thereby obligated to recognize, bargain with and provide information to the Union under *Burns* and its progeny.

**2.   Petitioners' Objections to the Board's Finding that Orange Place and Management Services are Successor Employers to HELP**

Despite this substantial evidence supporting the Board's conclusion, Petitioners proffer three grounds for reversing the Board's finding that Orange Place and Management Services are successor employers to HELP. First, Petitioners contend that there is no basis in fact for the ALJ's finding that there was even a defined bargaining unit at HIB consisting of housekeepers and housemen. Second, even assuming that there was a defined bargaining unit, Petitioners argue that upon assuming control of HIB, they made substantial alterations in the character of such unit, rendering it no longer appropriate. Finally, Petitioners assert that the Board erred by finding that they hired a substantial and representative employee complement in May of 1996. For the reasons set forth below, we find each of Petitioners' arguments unpersuasive.

**a.   The Historical Bargaining Unit**

With respect to the existence and definition of the bargaining unit, Petitioners' contention that the record lacks any evidentiary basis to support the ALJ's findings is simply false. The ALJ found, and the Board agreed, that the housekeeping employees at HIB, consisting of housekeepers and housemen only, constituted a unit appropriate for collective bargaining under the Act. Although the CBA was silent on the subject, the ALJ based his conclusion on what he

determined was the credible testimony of the Union's representative Dennis Dingow. In particular, Dingow testified that the specific job classifications covered by the CBA were understood between the parties given their relationship going back twenty or more years. Dingow further testified that inspectresses were excluded from the bargaining unit because they were considered part of management, and that historically a separate union had represented the laundry workers. While Petitioners may disagree with the conclusions drawn by the ALJ and the Board from Dingow's testimony, this fact does not render such testimony non-existent. *See South Prairie Constr. Co. v. Operating Eng'rs Local 627*, 425 U.S. 800, 805, 96 S. Ct. 1842, 1845 (1976) (noting that the "selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed'" (quoting *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491, 67 S. Ct. 789, 793 (1947))).

Moreover, Petitioners fail to recognize that the Act does not require the Board to select the "most" appropriate bargaining unit. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610, 111 S. Ct. 1539, 1542 (1991) ("[e]mployees may seek to organize 'a unit' that is 'appropriate' -- not necessarily *the* single most appropriate unit."); *see also Cal. Pac. Med. Ctr. v. NLRB*, 87 F.3d 304, 308 (9th Cir. 1996) ("The Board need only select an appropriate unit, not the most appropriate unit."). Thus, even if we were to agree that a more appropriate bargaining unit would include inspectresses and laundry workers, this conclusion would not permit us to reverse the Board's findings regarding the bargaining unit, which are supported by substantial record evidence.

### b. Bargaining Unit Alterations

Likewise, Petitioners have failed to carry their burden of showing that they substantially altered the historical bargaining unit upon assuming control of HIB. *See Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 118 (D.C. Cir. 1996) ("'[t]he Board places a heavy evidentiary burden on a party

attempting to show that historical units are no longer appropriate'" (quoting *Banknote Corp. v. NLRB*, 84 F.3d 637, 647 (2d Cir. 1996))). In this respect, the Board's cogent analysis on the subject bears repeating:

> [Petitioners] Orange Place and Management Services argue that the unit has significantly changed and that laundry workers and inspectresses should be included in the unit. In this respect, Gerish testified that [Petitioners] 'have a team approach to the housekeeping department' that included inspectresses and laundry workers along with housekeepers and housemen or houseporters. He stated: 'they all help out under the direction of the operations manager and the general manager.' The [Petitioners] also cite certain payroll records of the predecessor HELP which once included two inspectresses in the housekeeping department. The [Petitioners] offer no other evidence.

> * * * *

> The record shows that the job duties for housekeeper/maid and housemen did not change in any significant measure between the time that the predecessor employers operated HIB and the time that [Petitioners] operated HIB. Nor has there been a change in the degree to which laundry workers assist the housekeepers/maids and housemen. In this regard, Union Business Representative Dennis Dingow testified that, under the predecessor employers, laundry workers pitched in and helped the housekeeping staff at times of high occupancy. In these circumstances, the conclusory testimony concerning team work, without specific evidence, does not constitute a "compelling circumstance" sufficient to overcome the significance of bargaining history. Last, the fact that the predecessor carried two inspectresses on the housekeeping payroll says nothing about their current and actual work

conditions. We therefore agree with the judge that the historical unit of housekeeping employees is appropriate.

[J.A. at 5-6]. For the reasons stated by the Board, we agree.

### c. The Substantial and Representative Complement Rule

Lastly, we address Petitioners' argument that the Board violated the substantial and representative complement rule by conducting its successorship analysis as of May 1996, shortly following Orange Place's acquisition of HIB. More specifically, Petitioners contend that the Board should have waited until at least July of 1996 to make the successorship determination, because they intended to significantly expand operations at HIB, including the hiring of upwards of thirty-five housekeeping employees.

As recited above, the successorship inquiry focuses primarily on whether a new employer hires a majority of its employees from its predecessor. The substantial and representative complement rule governs the timing of this analysis by "'fixing the moment when the determination as to the composition of the successor's workforce is to be made.'" *Briggs Plumbingware, Inc. v. NLRB*, 877 F.2d 1282, 1287 (6th Cir. 1989) (quoting *Fall River Dyeing*, 482 U.S. at 47, 107 S. Ct. at 2238). "If at that moment a majority of the successor's employees are former employees of the predecessor, the successor's obligation to bargain with the incumbent union accrues." *Id.*

As for the specific timing of the determination, if the new employer continues operations uninterrupted -- as was the case in *Burns* -- the Board generally makes the required determination at the time of transfer of control. *See Fall River Dyeing*, 482 U.S. at 47, 107 S. Ct. at 2238 (citing *Burns*, 406 U.S. at 275, 92 S. Ct. at 1576). However, in situations involving "a start-up period by the new employer while it gradually builds its operations and hires employees," the Board must determine some later date at which the new

employer has hired a substantial and representative complement of employees. *Id.* The Board determines this date based on the totality of the circumstances, and weighs a number of equally important factors, including:

(a) whether the job classifications designated for the operation were filled or substantially filled; (b) whether the operation was in normal or substantially normal production; (c) the size of the complement on the date of normal production; (d) the time expected to elapse before a substantially larger complement would be at work; and (e) the relative certainty of the employer's expected expansion.

*Briggs Plumbingware*, 877 F.2d at 1287 (internal quotations omitted). In addition, the determination date must follow a union's clear and unequivocal demand for recognition and bargaining. *Id.*

Applying these factors, we find that substantial evidence supports the Board's decision to conduct the successorship analysis no later than the end of May 1996, by which time the Union had twice, by letter, demanded recognition, bargaining, and information from Management Services. More specifically, immediately upon acquiring HIB, Orange Place and Management Services substantially filled the relevant job classifications by hiring eighteen housekeepers and four housemen, a majority of which were former HELP employees. Moreover, despite Petitioners' rather strained arguments to the contrary, there is no reasonable dispute that upon acquiring HIB, Orange Place and Management Services continued normal operations at the hotel without interruption. Finally, even accepting Petitioners' self-serving and speculative testimony regarding their plans to expand to thirty-five housekeeping employees -- which number, in any case, appears to include inspectresses and laundry workers -- the substantial and representative complement rule does not require the Board to wait to make a successorship determination until a new employer has hired its entire

projected workforce.  Here, taking Petitioners' expansion plans at face value, Orange Place and Management Services still had retained nearly sixty-three percent (twenty-two out of thirty-five) of their projected housekeeping workforce by the end of May.  Courts routinely have found that similar percentages constitute a substantial and representative complement of employees.  *See, e.g., Briggs Plumbingware*, 877 F.2d at 1287 (finding that a new employer had hired a substantial and representative complement of employees when it had retained sixty-eight percent of its projected workforce).  Accordingly, based on the totality of the circumstances, we find substantial evidence in the record to support the Board's conclusion that Orange Place and Management Services had hired a substantial and representative complement of HIB's housekeeping employees by the end of May 1996.

   3.   **Substantial Evidence Supports the Board's Finding that Hotel Services is a Successor Employer to Management Services**

As the final piece in the successorship puzzle, the Board determined that Hotel Services was a successor employer to Management Services.  Even the most cursory review of the record reveals substantial evidence to support this finding.  More specifically, immediately following Orange Place's January 1998 transfer of HIB to Patriot, Hotel Services retained all seventeen of Management Services' housekeeping employees without interviews or applications.  Furthermore, this transfer did not result in any hiatus in service or significant changes in job functions or working conditions.  In short, Petitioners cannot reasonably dispute that there was "substantial continuity" in operations at HIB across the transfer of ownership from Orange Place to Patriot, thereby

rendering Hotel Services a successor employer to Management Services.[9]

### E.  Petitioners' Affirmative Defenses

Petitioners also contend that the Board erred in rejecting their affirmative defenses based on the statute of limitations in Section 10(b) of the Act, the equitable doctrine of laches, and their alleged good faith doubt as to the Union's majority status.

### 1.  Section 10(b)

Addressing Petitioners' statute of limitations argument, Section 10(b) of the Act provides, in pertinent part, "[t]hat no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . ."  29 U.S.C. §160(b).  Here, the Union filed its initial unfair labor practice charge against Orange Place and Management Services on July 11, 1996, less than two months after Orange Place acquired HIB and approximately six weeks after the Union's May 24, 1996 letter to Management Services requesting information on HIB's housekeeping employees and dates to commence negotiations over a new collective bargaining agreement.  Thus, at the earliest, the 10(b) clock started to run when Orange Place and Management Services elected to ignore the Union's May 24 letter.  Likewise, the Union filed its unfair labor charge against Hotel Services on May 12, 1998, a mere

---

[9]The Board also determined that Hotel Services and Management Services constituted a single employer.  While this finding was not necessary to the Board's successorship analysis, we note that substantial record evidence, including, but not limited to the facts discussed in Section II(A)(6) of this opinion, supports the Board's single employer finding.  *See South Prairie Construction Co. v. Operating Engineers Local 627*, 425 U.S. 800, 802 n.3, 96 S. Ct. 1842, 1843 n.3 (1976) (noting that the controlling criteria for finding single employer status are interrelation of operations, common management, centralized control of labor relations and common ownership).

four days after Hotel Services informed the Union that it had no intention to bargain. Accordingly, we find Petitioners' 10(b) argument wholly without merit.

### 2. Laches

Petitioners' laches defense is equally unavailing. "Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party." *Brown-Graves Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). As noted above, the Union diligently pursued its bargaining interests at HIB, interacting with the various employers and requesting information and bargaining dates from HELP and Petitioners on multiple occasions. Rather than respond to the Union's requests, HELP and Petitioners engaged in unreasonable delay tactics and obfuscation. In this regard, we find compelling the Union's May 4, 1998 letter to Petitioners detailing the Union's numerous efforts to gain information and secure bargaining dates from Petitioners, efforts that were repeatedly rebuffed.

Furthermore, we find entirely unpersuasive Petitioners' related contention, based on the testimony of James Gerish, that they were prejudiced by the Union's failure to file an unfair labor practice charge against HELP. Specifically, Petitioners appeal to equity, contending that they were prejudiced because they did not even know that a union existed at HIB prior to Orange Place's May 13, 1996 acquisition of the property. Under this theory, Petitioners argue that an earlier charge against HELP would have placed Petitioners on notice of the Union's presence and perhaps affected Orange Place's decision to proceed with the purchase. The record, however, plainly belies this contention. Indeed, the Union first contacted Management Services by letter on May 6, 1996, *a week prior to Orange Place's acquisition of HIB*. In this May 6 letter, the Union informed Management Services of the Union's position that Management Services would be a successor employer at HIB,

with an obligation to bargain with, and provide information to, the Union. In short, the record clearly reveals that, at a minimum, Management Services was on notice of the Union's presence at HIB prior to May 13, 1996. Petitioners' argument to the contrary is simply unsupportable.

### 3. Good Faith Doubt as to the Union's Majority Status

As a final affirmative defense, Petitioners contend that they harbored a good faith doubt as to the Union's majority status at HIB, thereby rebutting any presumption of majority status that the Union may have enjoyed at HIB. In order to rebut the Union's presumption of majority status, Petitioners must establish that they "had a reasonable good faith doubt as to the Union's majority support." *Straight Creek*, 164 F.3d at 297. "The burden of proof for the employer is merely to prove it had objective reasons for doubting the union's majority status." *Briggs Plumbingware*, 877 F.2d at 1288.

Here, Petitioners have fallen well short of carrying their burden. In particular, Petitioners contend that their good faith doubt resulted from the Union's purported abandonment of the bargaining unit during HELP's tenure as the employer at HIB. But, as noted in detail above, the record reveals that the Union diligently pursued its bargaining rights with HELP following Summit's October 1995 transfer of HIB to the Bank. This included the delivery of multiple letters to HELP requesting bargaining dates and information, face-to-face negotiations with HELP in December of 1995, and a follow-up letter on February 9, 1996 when HELP failed to deliver a contract proposal as promised. Accordingly, we find that based on substantial record evidence, the Board properly rejected Petitioners' unfounded contention that the Union abandoned the bargaining unit at HIB.

### F. Petitioners' Evidentiary Objections

We address only passingly Petitioners' final contention that the ALJ improperly admitted and considered evidence -- in particular, certain documents and testimony by Dennis

Dingow regarding the nature of the bargaining unit and the number of housekeeping employees -- to substantiate the ALJ's findings in violation of the Federal Rules of Evidence. In making this argument, Petitioners fail to recognize that the ALJ was not obliged to strictly adhere to the Federal Rules of Evidence. Rather, Section 10(b) of the Act only required the ALJ to comply with the rules "so far as practicable." 29 U.S.C. §160(b). Here, we do not believe that the ALJ so disregarded the rules of evidence as to warrant a reversal of the Board's findings. Accordingly, we also find Petitioners' evidentiary objections without merit.

## IV.  CONCLUSION

For all of the aforementioned reasons, we GRANT the Board's petition and direct the enforcement of its final order.